UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID MUNIZ,

     Plaintiff,

vs.                                    Case no. 3:05-cv-172-J-33MMH

GCA SERVICES GROUP, INC.,
SUNSTATES MAINTENANCE
CORPORATION n/k/a
GCA SERVICES GROUP, INC.,
and RICHARD K. FOWLER,

     Defendants.

_____

## **ORDER**

     This matter comes before the Court on Muniz's Motion for Summary Judgment on Counterclaim as Matter of Law (Doc. # 81-1); Muniz's Motion for Partial Summary Judgment as to the Earnout Incentive Program (Doc. #93), Defendants' Motion to Dismiss Counts II, III, IV and V of Second Amended Complaint (Doc. #77), and Defendants' Motion for Summary Judgment as to Counts I-VI of Plaintiff's Second Amended Complaint and as to Counter Plaintiff, GCA Services Inc.'s Counterclaim for Breach of Promissory Note (Doc. #95).[1] On April 7, 2006, Defendants filed a response to

_____

     [1] In both motions for partial summary judgment and his response to Defendants' motion for summary judgment, Muniz requests a hearing on the respective motions. The Court denies those requests. L.S.T., Inc. v. Crow, 49 F.3d 679, 684 n. 9 (11th Cir. 1995)("Nothing in Rule 56 requires a district court to conduct a hearing on a motion for summary judgment.").

Muniz's motion for summary judgment on counterclaim. (Doc. #85). On April 27, 2006, Defendants filed a response to Muniz's motion for summary judgment as to the earnout incentive program. (Doc. #104).  On April 28, 2006, Muniz filed a response to Defendants' motion for summary judgment. (Doc. #105).  For the reasons stated below, Muniz's motions for partial summary judgment are denied, Defendants' motion to dismiss is denied, and Defendants' motion for summary judgment is granted in part and denied in part.

## I. Facts

Muniz began his employment with Sunstates in 1988. (Doc. #96 at 2).  Muniz was hired to work in North Carolina. (Doc. #87, Muniz Dep. at 30).  In 1990, Sunstates and Muniz formalized the employee and employer relationship in a employment contract. (Doc. #96 at 2).  Through the years, Muniz advanced within Sunstates, a company owned by Richard Fowler.

In 2000, Cenplex approached Muniz. (Doc. #87, Muniz Dep. at 102).  Cenplex offered Muniz employment with Cenplex. (Id.)  Muniz and Cenplex engaged in negotiations as to the terms of his employment. (Id. at 102-122).  In addition to a base salary, Cenplex offered Muniz ownership in Cenplex. (Id. at 122).  Before finalizing the Cenplex agreement, Muniz consulted Fowler. (Id.)  Muniz advised Fowler of the Cenplex offer. (Id.)

Not wanting to lose Muniz, Fowler asked Muniz to consider remaining with Sunstates. (Id. at 127).  Fowler offered Muniz a

$15,000.00 a year raise. (Id. at 137).  Fowler also mentioned the possibility of ownership in Sunstates. (Doc. #86, Fowler Dep. at 129).  Muniz decided to forgo the Cenplex offer and remain at Sunstates. (Doc. #87, Muniz Dep. at 183).  Muniz remained employed in one of Sunstates' North Carolina divisions. (Id. at 187).

In May 2003, Fowler sold Sunstates to GCA Services Group, Inc. (Doc. #96 at 4).  The purchase was effectuated through GCA's purchase of Sunstates' stock. (Id. at 4).  GCA offered certain incentives to Sunstates' employees.  Among these were the opportunity to purchase loan stock and participate in GCA's stock option program. (Id.)  Under the loan stock program, GCA provided an employee a loan on which the employee signed a promissory note. (Id.)  The employee then used the loaned money to purchase GCA stock. (Id.)  Muniz took advantage of both the loan stock and stock option incentives. (Id.)

On January 12, 2004, Muniz, through the loan stock program, purchased $100,000.00 in GCA stock. (Doc. #98-2 at 28).  Muniz paid for the stock with a promissory note to GCA. (Id. at 36).  Also on January 12, 2004, Muniz entered a stock option agreement. (Doc. #98-3 at 1).  Pursuant to the agreement, Muniz was provided the right or option to purchase 2,500 shares of GCA stock at $10.00 a share. (Id.)  The option vested and first became exercisable three years after the agreement was entered. (Id.)  Muniz entered into a third agreement on January 12, 2004, a non-solicitation agreement.

(Doc. #98-3 at 16).  Pursuant to the non-solicitation agreement, Muniz agreed that, <u>inter alia</u>, after Muniz's employment with GCA ceased, for a period of 24 months, Muniz would not solicit business from GCA's customers. (<u>Id.</u> at 17).

Another incentive related to GCA's purchase of Sunstates was called the earnout incentive. (Doc. #96 at 4).  The earnout incentive stemmed from the GCA/Sunstates purchase agreement, which contained an earnout provision. (<u>Id.</u>)  Pursuant to the earnout provision, if, during a twelve month period ending on May 31, 2004, Sunstates consolidated gross profit exceeded $11,000,000.00, GCA's purchase price of Sunstates would be increased by an amount equal to 2.5 times such excess. (Doc. #86, Fowler Dep., Ex. #4).  "More specifically, for each $1 that Sunstates's consolidated gross profits exceeded $11 million, the sales price for Sunstates' stock would be increased by $2.50 . . . ." (Doc. #85-1 at 4).  In short, the earnout would benefit those with an ownership interest in Sunstates.  Sunstates' non-owner employees would not directly benefit.

However, Fowler decided to indirectly include certain Sunstates employees ("management team") in the earnout. (Doc. #96 at 6).  Fowler informed the management team that, if, during the earnout period, gross margins equal or exceed $12,000,000.00 the management team would share in the earnout. (Doc. #105-2 at 2).  Specifically, Fowler indicated that he would use the earnout to

cover the cost of the loan stock and provide a substantial bonus. (Id.)  In a June 18, 2003 letter to Muniz, Fowler explicitly described how Muniz would benefit from the earnout. (Id. at 1). The letter indicated that GCA had approved Muniz for $100,000.00 in loan stock. (Id.)  In the letter, Fowler further provided that if the goals are achieved, Fowler would pay for Muniz's loan stock and would provide Muniz a $20,000 bonus. (Id.)

Subsequent to GCA's purchase of Sunstates, on November 13, 2003, Muniz accepted an offer to become regional manager of Sunstates' Florida region. (Doc. #86, Fowler Dep., Ex. 12).  In connection with the new job, Muniz moved from North Carolina to Florida.  Muniz held this new position until June 21, 2004, when GCA terminated Muniz's employment. (Doc. #98-3 at 26).  GCA informed Muniz of the termination in a letter date June 16, 2004. (Id.)  In the letter, GCA informed Muniz that as a result of a merger, certain positions were being eliminated, including Muniz's position. (Id.)  In addition, GCA informed Muniz that he would receive a severance payment of $55,384.62, the equivalent of 30 weeks pay, and a $2,769.23 vacation payout, representing unused vacation time. (Doc. #98-3 at 26).

After being terminated, Muniz filed his initial complaint. Muniz amended his complaint twice.  The second amended complaint contains six counts: (1) breach of contract; (2) violation of Florida's civil remedies for criminal practices act ("civil

theft"); (3) conversion; (4) unjust enrichment; (5) breach of fiduciary duty; and (6) wrongful termination.  (Doc. #72).  On February 9, 2006, Defendants filed an answer to the second amended complaint and also moved to dismiss counts two through five. (Doc. ##76 and 77).

On April 14, 2006, Defendants moved for summary judgment on all counts and the Defendant's counterclaim for monies owed pursuant to the promissory note that Muniz executed to purchase loan stock. (Doc. #95).  The Court will address each count in turn.

## II. Standards

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. Of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913,

918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324).  If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Insurance of Wausau,

835 F.2d 855, 856 (11th Cir. 1988)).

## B. Motion to Dismiss

In deciding a motion to dismiss, the Court accepts the facts of the complaint as true and views them in the light most favorable to the non-moving party.  See Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004)(citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998)).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  75 Acres, LLC v. Miami-Dade County, Fla., (11th Cir. 2003)(citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The plaintiff is not required by the Federal Rules of Civil Procedure to "set out in detail the facts upon which he bases his claim."  Conley, 355 U.S. at 47.  All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The statement needs to be sufficient enough to afford the Defendant "fair notice of what the claim is and the grounds upon which it rests."  United States v. Baxter Int'l, Inc., 345 F.3d 866, 881 (11th Cir. 2003)(quoting Conley, 355 U.S. at 47).  Thus, the issue in a 12(b)(6) motion is not whether the plaintiff will ultimately prevail on his or her claim, but rather, whether the allegations contained in the complaint will be sufficient to allow discovery as

to their proof.  Jackam v. Hosp. Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579-80 (11th Cir. 1986).  "Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262-63 (11th Cir. 2004)(citation omitted).

## III. Analysis

## A. Choice of Law

In the motion for summary judgment, as to certain contracts, the subject of this litigation, Defendants claim that North Carolina law applies. (Doc. #96 at 13).  Moreover, in the motion to dismiss, the Defendants claim that, pursuant to the Restatement (Second) of Conflicts of Laws' significant relationship test, North Carolina has the most significant relationship to the dispute. (Doc. #78 at 8).  On all counts, Muniz appears to proceed under Florida law. (Doc. #105-1 at 2).  Accordingly, the Court is faced with a choice of law issue.

This is a diversity action.  In diversity cases, the Court applies the substantive law of the forum, Florida, including Florida's choice of law rules.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941).

In Acme Circus Operating Co. v. Kuperstock, 711 F.2d 1538 (11th Cir. 1983), the Eleventh Circuit provided the following three step

approach to a choice of law analysis:

> The first step in choice of law analysis is to ascertain the nature of the problem involved, i.e. is the specific issue at hand a problem of the law of contracts, torts, property, etc. The second step is to determine what choice of law rule the state of [Florida] applies to that type of legal issue. The third step is to apply the proper choice of law rule to the instant facts and thereby conclude which state's substantive law applies.

Id. at 1540.

As noted, Muniz has filed a six count complaint and GCA has filed two counterclaims.  Among the six counts and counterclaims there are both contract and tort claims.  Thus, the nature of the problem is both tort and contract.

With the nature of the problem established, the Court next determines the choice of law rule that Florida applies.  In the contract context, for purposes of determining whether a valid contract was formed, Florida adheres to the lex loci contractus doctrine.  Trumpet Vine Invs., N.V. v. Union Capital Partners I, 92 F.3d 1110, 1119 (11th Cir. 1996).  As to torts, "Florida applies the significant relationship test of the Restatement (Second) of Conflicts of Laws." Nelson v. Freightliner, LLC, 154 Fed. Appx. 98 (11th Cir. 2005)(citing Bishop v. Fla. Specialty Paint Co., 389 So. 2d 999, 1001 (Fla. 1980)).  The Court will apply these approaches to the facts.

There are multiple contracts at issue in this action.  Among these are a stock options contract, a 2000 ownership contract, a

earnout incentive contract, 1990 employment contract, a loan stock contract, a non-solicitation agreement, and a promissory note.  The latter four contracts each contain a choice of law provision.  Pursuant to the lex loci contractus doctrine, "the law applied to questions regarding validity and substantive obligations of a contract is the law of the state in which the contract is 'made.'"  Motmanco, Inc. v. McDonald's Corp., Case no. 3:04-cv-270-J-99HTS, 2005 U.S.Dist.LEXIS 33965, at *10-11 (M.D. Fla. March 30, 2005).  However, Florida  gives deference to the parties' choice of law.  Unless violative of Florida public policy, courts defer to contractual choice of law clauses.  Gillen v. United Servs. Auto. Ass'n, 300 So. 2d 3, 6-7 (Fla. 1974).  Muniz does not raise any viable arguments that any of the contracts violate Florida public policy.  As such, and, pursuant to these contracts' respective choice of law provisions North Carolina law controls the 1990 employment contract, Delaware law controls the loan stock contract and the promissory note, and Pennsylvania law governs the non-solicitation agreement.

This leaves the 2000 ownership contract, the earnout incentive contract, and the stock option agreement.  As noted, in Florida, the contract is governed by the law where the contract is created.  A contract is created at the location of the last act necessary to create a contract.  Trumpet Vine Invs., N.V., 92 F.3d at 119.  The last act necessary to complete a contract is acceptance.  Prime Ins.

11

Syndicate, Inc. v. B.J. Handley Trucking, Inc., 363 F.3d 1089, 1093 (11th Cir. 2004)(citing Buell v. State, 704 So. 2d 552, 555 (Fla. 4th DCA 1997)); Walden v. Vaughn, 579 S.E.2d 474, 477 (N.C. Ct. App. 2003).  It was in North Carolina that Muniz agreed to forgo alternative employment with Cenplex and continue working for Sunstates.  Thus, the 2000 ownership contract was accepted in North Carolina.  As such, North Carolina law governs the 2000 ownership contract.  Equally, as the stock option agreement was entered in North Carolina, North Carolina law governs.

The final contract is the earnout incentive contract.  Muniz claims that two letters encompassed the agreement. (Doc. #87, Muniz Dep. at 207).  Namely, a letter to all managers informing them of the earnout and the goals and a second letter, addressed to Muniz, informing Muniz that if goals were met his loan stock would be paid and he would be provided a $20,000 bonus.  (Doc. #105-2).  Similar to a reward scenario, the contract was unilateral.  See 1-1 Corbin on Contracts § 1.23 at 94-95 (2006)(recognizing that unilateral contract analysis is used in cases "involv[ing] claims by employees against present and former employers for employment benefits [including] . . . incentive payments . . . .").  A unilateral contract is created upon compliance with the offeror's terms of acceptance. See Touchstone v. McDermott, 234 F.3d 1133, 1148 (11th Cir. 2000)("in unilateral contract formation, where the offeror instructs the offeree on how to accept the offer, . . . only that

method of acceptance creates a valid contract."). Here, the terms were clear. The letters state that, to benefit from the earnout, Sunstates must achieve gross margins of $12,000,000.00 during the earnout period. Pursuant to the letters, the earnout period began on June 1, 2003 and ended on May 30, 2004. Thus acceptance of the unilateral contract would have occurred on May 30, 2004. <u>Shapiro v. Associated Int'l Ins. Co.</u>, 899 F.2d 1116 (11th Cir. 1990)(citing <u>Ray-Hof Agencies, Inc. v. Petersen</u>, 123 So. 2d 251, 255 (Fla. 1960)("place where contract is made is place of performance in unilateral contract."). On May 30, 2004, Muniz was employed in Florida. Thus, the contract would have been completed in Florida. As such, Florida law would apply to the earnout incentive contract. Based on the foregoing, North Carolina law applies to the 1990 employment contract, the 2000 ownership contract, and the stock options agreement; Pennsylvania law applies to the non-solicitation agreement; Delaware law applies to the loan stock agreement and the promissory note; and Florida law applies to the earnout incentive contract. Next, the Court determines the law governing Muniz's tort claims.

As noted, in the tort context, Florida follows the most significant relationship test of the Restatement (Second) of Conflicts of Law.[2] However, as covered below, because under North

---

[2] "Several courts have applied separate contract and tort choice of law analysis to related contract and fraud or tort claims raised in the same case . . . ." <u>Merriman v. Convergent</u>

Carolina and Florida law the result of Muniz's tort claims would be the same, the Court need not engage in a choice of law analysis. See Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1382 (11th Cir. 2006)(citing Brewer v. Memphis Pub. Co., Inc., 626 F.2d 1238, 1242 n.7 (5th Cir. 1980)(first step in choice of law analysis is to determine if a conflict exists); Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortgage Corp., Case no. 5:05-cv-260-Oc-10GRJ, 2006 U.S. Dist. LEXIS 39728 (M.D. Fla. June 15, 2006)(declining to engage in choice of law analysis as application of the law of either state would lead to same result). With the applicable law settled, the Court proceeds to the analysis of the individual claims.

## B. Breach of Contract

As noted, Muniz alleges the breach of several contracts. Muniz's breach allegations are vague. However, Muniz appears to claim that the following contracts were breached: 1990 employment contract, stock options contract, loan stock contract, earnout incentive contract, and the 2000 ownership contract. The court will jointly address the stock option and loan stock contracts. The Court will separately address the remaining contracts.

## 1. Loan Stock Contract and Stock Options

---

Bus. Sys., Inc., No. 90-30138-LAC, 1993 WL 989418, at *3 (N.D. Fla June 23, 1993)(citing Consolidated Data Terminals v. Applied Digital Data Sys., 708 F.2d 385, 390 n.3 (9 Cir. 1983); Interwest Medical Corp. v. Longterm Care Found. of America, 748 F. Supp. 467, 469 (N.D. Tex. 1990).

As noted, Delaware law governs the loan stock contract and North Carolina law governs the stock options contract. Both Delaware and North Carolina follow the plain meaning approach to contract interpretation. Commerce Nat'l Ins. Servs. v. Buchler, Civ. No. 02-037-SLR, 2003 U.S.Dist.LEXIS 22429, at *10 (D. Del. Dec. 10, 2003)(interpreting contract pursuant to the plain meaning of its terms); Crawford v. Potter, Civil No. 1:04-cv-00303, 2005 U.S.Dist.LEXIS, at *12 (M.D.N.C. Oct. 4, 2005)("contract[] . . . must be interpreted according to its plain meaning."). Attributing the plain meaning to the contracts' terms, Muniz's breach of contract claims fail.

Paragraph two of the stock option agreement states that the stock option first becomes exercisable on the third anniversary of the grant. (Doc. #98-3 at 1). The stock option was granted on January 12, 2004. (Id.) As such, the option did not vest until January 12, 2007. Muniz was terminated on June 21, 2004, before the vesting of the option. Moreover, in paragraph four, the stock option agreement provides that the option may not be exercised after the termination of optionee's employment. (Id. at 2). Based on the plain meaning of the contract terms, since the option did not vest before Muniz's termination, there is no breach.

Similarly, following the plain meaning of the loan stock agreement, there was no breach. Muniz does not argue that GCA provided him with the loan stock. Pursuant to the agreement, upon

termination, GCA was permitted to repurchase the loan stock. (Doc. #98-2 at 24).   The right to repurchase under the agreement was exercisable within six months of termination, upon written notice. (Id.)   GCA timely issued such a notice (Doc. #98-3 at 24). Accordingly, the stock agreement was not breached.   For these reasons, as to the claimed breach of the stock options and loan stock contracts, the Court grants Defendants' motion for summary judgment.

## 2. 2000 Ownership Agreement

As noted, North Carolina law applies to the 2000 ownership agreement.   Muniz claims that the consideration for ownership in Sunstates was Muniz's agreement to continue working for Sunstates and forgo employment with Cenplex.   (Doc. #87, Muniz Dep. at 183-184).   Defendants claim that this is insufficient consideration, and, as such, Defendants argue the contract is unenforceable. Defendants cite Humphrey v. Hill, 285 S.E.2d 293 (N.C. Ct. App. 1982).

In Humphrey, the plaintiff sued on an employment contract. Id. at 295.   Like Muniz, the plaintiff in Humphrey alleged that, in exchange for his continued employment, his employer agreed to provide him ownership in the company. Id.   The trial court granted a directed verdict in defendant's favor, and the appellate court affirmed. Id. at 296. The appellate court held that the employment

16

agreement was unenforceable. _Id._  So finding, the court first identified that the contract did not fix a definite term of employment. _Id._ at 295.  However, the court recognized that North Carolina courts "have been reluctant, however, in the presence of some indication of duration or of good consideration in addition to services contracted to be rendered, to hold a 'permanent' employment contract unenforceable merely because it fails to specify a term of employment."  _Id._ at 295.  As such, the court examined the plaintiff's proffered consideration, giving up employment. _Id._ at 296.  The court found this consideration inadequate to sustain the contract, stating "[t]he abandonment of other activities and interests is 'a thing almost every desirable servant does upon entering new service, but which, of course, cannot be regarded as constituting any additional consideration to the master.'"  _Id._ (citing _Minter v. Tootle, Campbell Drygoods Co._, 187 Mo.App. 16, 28 (1915)).  Accordingly, the _Humphrey_ court found that, since the employment contract did not contain a term of duration nor sufficient consideration, the contract was unenforceable. _Id._

The Muniz facts are analogous.  Muniz has not contended that the 2000 employment contract was for a set duration, nor does Muniz claim consideration, other then giving up employment with Cenplex. Moreover, in his response, Muniz does not attempt to establish that the employment contract provided a set duration.  In fact, Muniz makes no attempt to distinguish _Humphrey_.

In addition to the Humphrey decision's impact, the Court also identifies the indefiniteness of Muniz's recollection of the alleged terms of the contract. Muniz relies on his recollection of the contract to establish the contract's terms. By Muniz's own admissions, he cannot recall the exact parameters of the contract. When questioned about the terms of the contract, Muniz used phrases like, "as best I recall" and "I don't recall . . . exactly." (Doc. #87, Muniz Dep. At 139-140). Under North Carolina law, terms of compensation "must be definite and certain or capable of being ascertained from the contract itself." Mayo v. N. Carolina State Univ., 608 S.E.2d 116, 121 (N.C. Ct. App. 2005)(citing Howell v. C.M. Allen & Co., 174 S.E.2d 55, 56 (N.C. Ct. App. 1970)). Muniz's recollections do not satisfy this requirement. Accordingly, for the foregoing reasons, as to the breach of the 2000 ownership agreement, Defendants' motion for summary judgment is granted.

**3. Earnout Incentive Contract.**

As noted, Florida law applies to the earnout incentive contract. Muniz claims that he is owed monies pursuant to an earnout incentive contract. Muniz argues that two letters encompass the agreement. In the letters, Fowler offers participation in the earnout upon achievement of $12,000,000.00 in gross margins. As noted, the contract was unilateral. To accept, Muniz and the rest of the management team had to achieve $12,000,000.00 in gross margins ("Fowler earn out goal").

18

The evidence reveals that the $12,000,000.00 goal was not achieved. (Doc. #97-3 at 1). Accordingly, the unilateral earnout contract was not accepted. Muniz claims that the earnout was achieved. So alleging, Muniz identifies the fact that other employees participated in the earnout.

Fowler did share his earnout with certain employees. However, as explained below, Fowler was not contractually bound to do so. Accordingly, Muniz provides insufficient evidence that the Fowler earn out goal was achieved to withstand summary judgment.

The pleadings filed in this case along with a plain reading of the purchase agreement reveal that there were two earnout goals, the purchase agreement goal of $11,000,000.00 and Fowler's earnout goal of $12,000,000.00. During the earnout period, the gross profit was $11,870,718.00. (Doc. #97-3). As such, the purchase agreement earnout was achieved, but not the Fowler earnout goal. Accordingly, since the Fowler earnout goal, $12,000,000.00, was never achieved, the offer was never accepted and a contract was never formed. Thus, Muniz's breach of contract claim fails.

Muniz argues that Fowler represented that even if the Fowler earnout goal was not achieved, Fowler would work it out later. (Doc. #87, Muniz Dep. at 224). However, such "agreements to agree" do not create enforceable contracts. Boyce v. McMahan, 206 S.E.2d 496, 498-99 (N.C. Ct. App. 1974). For the foregoing reasons, as to the breach of the earnout incentive contract, the Court grants

Defendants' motion for summary judgment.

## B. Civil Theft

Muniz claims that, in not providing Muniz the benefits of the claimed contracts, the Defendants engaged in theft, as defined in Florida Statutes § 812.014(1), of those benefits.  As such, the civil theft claim is derivative of the contract claim.  As covered above, Muniz's breach of contract claims are unsustainable.  Thus, the civil theft claim must also fail.  Moreover, even if Muniz's breach of contract claims were sustainable, breach of contract is not the equivalent of § 812.014 theft. <u>Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.</u>, 777 F.2d 1504, 1507 (11th Cir. 1985)("section 812.014 does not apply to ordinary breaches of contract. . . .").  Accordingly, on Muniz's civil theft claim, the Court grants Defendants' motion for summary judgment.

## C. Conversion

As with the civil theft claim, Muniz's conversion claim is derivative of his contract claims.  Since the contract claims are unsustainable, the conversion claim fails.  Accordingly, on Muniz's conversion claim, the Court grants Defendants' motion for summary judgment.

## D. Unjust enrichment

As noted, the loan stock contract is governed by Delaware law.  The 1990 employment contract and stock options agreement are

20

governed by North Carolina law.[3]  Both Delaware and North Carolina law provides that a claim for unjust enrichment is improper if a valid contract exists.  <u>See</u> <u>Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.</u>, 42 F. Supp. 2d 423, 439 (D. Del. 1999)("[u]njust enrichment is a quasi-contract theory of recovery to remedy the absence of a formal contract."); <u>Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.</u>, 72 Fed. Appx. 916 (4th Cir. 2003)("in North Carolina . . . [a]n unjust enrichment claim is available only in the absence of an express contract between the parties.").

Above, the Court found that the stock option and loan stock contracts were valid contracts.  Moreover, the 1990 employment agreement is an enforceable contract.  As such, to the extent Muniz claims unjust enrichment in the context of the stock option, loan stock contract, and 1990 employment contract, Muniz's unjust enrichment claim fails.

Unlike the stock option, loan stock and 1990 employment contracts, the 2000 ownership and the earnout incentive agreement never achieved enforceable contract status.  As such, an unjust enrichment claim is not precluded by the existence of a contract. Defendants argue otherwise.

Defendants allege that the terms of Muniz's employment were

---

[3] "[T]he 'lex loci contractus' rule [applies to] . . . unjust enrichment claims" <u>Thunderwave, Inc. v. Carnival Corp.</u>, 954 F. Supp. 1562 (S.D. Fla. 1997)(citing <u>Trumpet Vine Invs., N.V.</u>, 92 F.3d at 119).

governed by a written employment agreement, likely referring to the 1990 employment contract, and, accordingly, an unjust enrichment claim is improper.  However, the 1990 employment contract, while valid, cannot be said to cover the subject matter of Muniz's compensation. <u>Horack v. Real Estate Co of Charlotte, Inc.</u>, 563 S.E.2d 47, 54 (N.C. Ct. App. 2002)("no recovery . . . if there is an express contract governing the same subject matter.").  The only compensation language in the 1990 employment contract is as follows "[t]he Employee shall receive such compensation for his services as the Company shall from time to time prescribe." (Doc. # 98-2 at 14).  The 1990 employment merely framed the general terms of Muniz's employment, laying the ground work for future compensation agreements.  Muniz sued, partly, on two such agreements.  However, Muniz's contract claims failed, thus, Muniz may seek equitable relief through Muniz's claims for unjust enrichment.  Accordingly, on the unjust enrichment claim, the Court denies Defendants' motion for summary judgment and motion to dismiss.

## E. Breach of Fiduciary Duty

Muniz alleges that he put his trust into Defendants to safeguard his general interests.  Defendants claim that to create a fiduciary relationship, trust must not only be given but also accepted.  On this, Defendants claim that Defendants did not accept Muniz's trust.  Moreover, Defendants allege that Muniz appears to

base the fiduciary duty on his contractual relationship with Defendants and contracts alone do not give rise to a fiduciary duty.

Both North Carolina and Florida recognize that a contract, alone, does not give rise to fiduciary duty. <u>Professional Mobile Home Brokers v. Security Pac. Housing Corp.</u>, No. 94-1910, 1995 U.S.App.LEXIS 9954, at *23 (4th Cir. May 3, 1995) ("[w]hen the relationship between the parties is merely contractual, there can be no fiduciary duty on either side."); <u>Tew v. Chase Manhattan Bank, N.A.</u>, 728 F. Supp. 1551, 1565 (S.D. Fla. 1990)(citing <u>In re Trauriq</u>, 34 B.R. 637, 639 (Bankr.S.D.Fla. 1983)("mere . . . contractual relationship does not create a fiduciary duty").  However, Muniz does not base his claims solely in contract.  Muniz claims that, in the course of Muniz's long employment relationship with Sunstates, he developed a close relationship with Fowler.  Similar arguments were raised in <u>Jones v. American Tobacco Co.</u>, 1989 U.S.Dist.LEXIS 17125 (M.D.N.C. May 19, 1989).  In <u>Jones</u>, the court found that "[n]o North Carolina cases have recognized a fiduciary duty arising from a mere employer-employee relationship, and, in fact, other courts have held that this relationship alone does not give rise to a fiduciary duty." <u>Jones v. American Tobacco Co.</u>, 1989 U.S.Dist.LEXIS 17125, at *15 (M.D.N.C. May 19, 1989)(citing <u>Lehner v. Crane Co.</u>, 448 F. Supp. 1127, 1131 (E.D. Pa. 1978)).  The <u>Jones</u> court further found that "long years of service do not remove the situation from the realm of the general employer-employee relationship." <u>Id.</u> at

19.   The <u>Jones</u> court's reasoning applies equally to the present facts.   As such, under North Carolina law, Defendants did not owe Muniz a fiduciary duty.   As such, there could be no breach of a non-existent duty.

Muniz's breach of fiduciary duty claim also fails under Florida law.   For a confidential or fiduciary relationship to exist under Florida law "there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." <u>Lanz v. Resolution Trust Corp.</u>, 764 F. Supp. 176, 179 (S.D. Fla. 1991).   Further, "[t]he fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." <u>Id.</u> (citing <u>Harris v. Zeuch</u>, 103 Fla. 183, 137 So. 135 (1931); <u>Barnett Bank of W. Florida v. Hooper</u>, 498 So. 2d 923 (Fla. 1986)).   As noted, Muniz has alleged that he was close to Fowler, and that he placed his trust in Fowler. However, there are no clear allegations or evidence that Fowler or any Defendant, accepted this trust; certainly nothing that would rise to the level of substantial evidence of a fiduciary relationship.   Accordingly, on the breach of fiduciary duty count, Defendants' motion for summary judgment is granted.

**F. Wrongful termination**

The wrongful termination count in Muniz's second amended complaint contains the following pertinent averments:

> 84. Mr. MUNIZ was an employee of GCA Services, Sunstates, and Fowler pursuant to the terms of the employment contract of September 3, 1990.

> 85. The employment contract provided a "Term of Employment Clause" listing various reasons for which Mr. MUNIZ's employment could end.

> 86. Mr. MUNIZ was terminated without cause from his employment with Defendants on June 21, 2004.

> 87. Mr. MUNIZ was terminated under false pretenses from his employment with Defendants.

> 88. The termination of Mr. MUNIZ violated the employment contract of September 3, 1990.

(Doc. #72 at 14).

These averments make clear that, although titled wrongful termination,[4] Muniz alleges a breach of his 1990 employment

---

[4] Muniz's response to Defendants' motion for summary judgment has a section captioned "Count VI seek damages for wrongful termination, a claim recognized under Florida and supported by the evidence." From the caption, it appears that Muniz claims something other then a simple breach of contract. However, in the body of this section, Muniz's arguments sound in contract. Moreover, unlike the caption indicates, Florida does not recognize a claim for wrongful discharge. Nankivil v. Lockheed Martin Corp., Case No. 3:02-cv-512-J-21-TEM, 2003 U.S.Dist.LEXIS 16712, at *36 (M.D. Fla. March 7, 2003) (quoting Bass v. Metro Dade County Dep't of Corr. and Rehab., 798 So. 2d 835, 836 (Fla. 3d DCA 2001)("'There is no action in Florida for the common law tort of wrongful termination.'").

25

contract.  As noted, North Carolina law governs the contract.

The plain terms of the 1990 contract establish that Muniz was an at will employee.  The agreement explicitly provided that "[t]he Employees' employment shall be on an at-will basis.  Either the Company or the Employee may terminate the Employee's employment at any time, whether with or without cause." (Doc. #87, Muniz Dep., Ex. 2 ¶3).  As such, Muniz could be terminated without cause.  Muniz claims that, despite the plain terms of the contract, Fowler assured Muniz that he would always have a job.  However, such representations are barred by the parole evidence rule. Lassiter v. Bank of N.C., 551 S.E.2d 920, 923 (N.C. Ct. App. 2001).  Resorting to the agreement's plain terms, Muniz was an at-will employee.  As such, Muniz could be terminated without cause.  Accordingly, there was no breach of the 1990 employment contract.  On Count VI, the Court grants Defendants' motion for summary judgment.

## G. Plaintiff's Motions for Summary Judgment

Muniz filed two motions for partial summary judgment.  In the first, Muniz moves for summary judgment on Defendants' counterclaim that Muniz violated his non-solicitation agreement.  In the second, Muniz moves for entry of summary judgment on his claim for breach of the earnout incentive contract.  For the reasons stated above, in the earnout incentive contract section, Muniz's second motion for summary judgment (Doc. #93) is denied.

In a counterclaim, Defendants claim that Muniz, in violation of Muniz's non-solicitation agreement, solicited business from one of GCA's customers, Revlon.  In the motion for summary judgment on this counterclaim, Muniz asserts several arguments, including lack of evidence and that Defendants breached the contract first.

Muniz's lack of evidence argument fails.  The record contains sufficient evidence of a breach to overcome Muniz's motion. Specifically, the Court identifies the deposition of Willie Cozar. In the deposition, Cozar explicitly states that Muniz informed him that Muniz intended to acquire the Revlon account. (Doc. #90, Cozar dep. at 13).  Cozar's deposition testimony provides sufficient evidence of a breach to withstand summary judgment.

As to the initial breach argument, citing to <u>Northern Trust Investments, N.A. v. Domino</u>, 896 So. 2d 880 (Fla 4th DCA 2005), Muniz argues that Defendants breached the agreement first, thus, Defendants cannot seek to hold Muniz to the agreement.  However, Muniz provides insufficient evidence of this initial breach to warrant a grant of summary judgment.  The non-solicitation provides that:

> The parties are entering into this Agreement in order to set forth the terms of the restrictive covenants that Employee will be subject to as a result of the Company's granting Employee options ("Options") to purchase common stock of GCA pursuant and subject to the GCA Stock Incentive Plan and/or making an award ("Award") to purchase common stock of GCA pursuant and subject to the GCA Loan stock.

(Doc. #81 at 1).  As covered above, GCA breached neither the loan stock nor the stock options agreement.  As such, contrary to Muniz's arguments, the evidence does not indicate that GCA breached the agreement.  Accordingly, on the evidence before the Court, Muniz is still obligated to comply with his duties pursuant to the non-solicitation agreement.  Further, since a genuine issue of material fact exists as to whether Muniz breached the agreement, the Court denies Muniz's motion for summary judgment.

**H.  GCA's Motion for Summary Judgment on Promissory Note Counterclaim.**

As noted above, Muniz financed the purchase of the GCA loan stock by executing a promissory note.  Pursuant to the explicit terms of the promissory note, "interest on the unpaid principle balance under this Note shall accrue at an annual rate equal to 4.02%." (Doc. #98-2 at 36).  GCA argues that, pursuant to these terms, Muniz owes GCA $1,773.00 in interest.  In his response, Muniz does not address GCA's motion for summary judgment on the promissory note.  Following the plain terms of the promissory note, the Court grants Defendants' motion for summary judgment on the promissory note counterclaim.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

1. The Motion for Summary Judgment on Counterclaim as Matter

of Law (Doc. 81-1) is **DENIED.**

2. Muniz's Motion for partial Summary Judgment as to the Earnout Incentive Program (Doc. #93) is **DENIED.**

3. Defendants' Motion to Dismiss Counts II, III, IV and V of Second Amended Complaint (Doc. #77) is **DENIED.**  In light of the grant of summary judgment on counts II, III, and V, to the extent the motion moves for dismissal of those counts, the motion is **DENIED** as moot.  As to count IV, unjust enrichment, the motion is **DENIED** on the merits.

4. Defendants' Motion for Summary Judgment as to Counts I-VI of Plaintiff's Second Amended Complaint and as to Counter Plaintiff, GCA Services Inc.'s Counterclaim for Breach of Promissory Note (Doc. #95) is **GRANTED** in part and **DENIED** in part.  The motion for summary judgment on count IV, unjust enrichment, is **DENIED.**  As to counts I, II, III, V, VI and the promissory note counterclaim, the motion is **GRANTED.**

5. The remaining claims in this action are: (1) Muniz's claim for unjust enrichment, count IV; and (2) GCA's counterclaim for violation of the non-solicitation agreement.

**DONE** and **ORDERED** at Jacksonville, Florida, this <u>28th</u> day of July, 2006.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record